*EQUAL EMPLOYMENT OPPORTUNITY COMMISSION v.*
*THE BOEING COMPANY*

No. CV '05-3034-PHX-FJM

# EXHIBIT A to Defendant's Response to Plaintiff EEOC's Motion To Compel 30(b)(6) Deposition Testimony and Motion For Sanctions

4703413.1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Equal Employment Opportunity Commission,<br><br>    Plaintiff,<br><br>vs.<br><br>The Boeing Company, a Delaware corporation,<br><br>    Defendant. | ) <br> ) <br> ) <br> ) <br> ) No.<br> ) CV05-3034-PHX-FJM<br> ) <br> ) <br> ) <br> ) <br> ) |

**DEPOSITION OF ROBERT GENE FEUERSTEIN**

Phoenix, Arizona
November 29, 2006
9:00 a.m.

PREPARED FOR:
Tibor Nagy, Jr., Esq.

REPORTED BY:
Kellie L. Konicke, RPR
AZ Certified Court Reporter
No. 50223



GRIFFIN & ASSOCIATES
court reporters

3030 North Central Avenue
Suite 1102
Phoenix, Arizona 85012

T 602.264.2230
   888.529.9990
F 602.264.2245

www.griffinreporters.com

Page 29

[1] A: I don't know.
[2] Q: And what was the information?
[3] A: The information was that there was some
[4] questions and concerns about some red lining she had
[5] performed on more than one document to change either the
[6] materials or the process that was involved in the
[7] manufacturing.
[8] Q: Tell me what red lining is.
[9] A: Red lining is — one of our products is to
[10] produce work instructions for manufacturing to work
[11] to — we take the design drawings and turn them into
[12] work instructions and builds materials for the
[13] manufacturing touch labor force so they can have
[14] something more specific than a drawing to work to.
[15] And after that document is printed and
[16] delivered to manufacturing, if there is a subsequent
[17] change or anything that's incorrect on it, we perform an
[18] activity that we call red lining, which means we change
[19] the information with a red pen. And each person is
[20] issued a stamp, so they stamp it and initial and date
[21] the stamp — or I'm sorry, date the stamp.
[22] Q: So is red lining an acceptable practice —
[23] A: Yes.
[24] Q: — as a general matter?
[25] A: Yes.

Page 30

[1] Q: But some concerns came up about red lines that
[2] Ms. Wrede had done?
[3] A: Yes.
[4] Q: Do you know what those concerns were?
[5] A: In general — I don't have the specifics. In
[6] general the concerns were the red lining did not match
[7] the procedures that we had in place at the time.
[8] Q: And wasn't red lining done to change a
[9] procedure?
[10] A: Yes. Red lining is done to change a procedure,
[11] but we also have our internal procedures that our folks
[12] work to, so if we change a manufacturing instruction and
[13] that's in effect changing a procedure, we have a
[14] procedure to use to do that as well.
[15] Q: So the concern was that she didn't follow the
[16] procedures to do the red lining correctly?
[17] A: Correct.
[18] Q: Was an investigation done into these questions
[19] and concerns?
[20] A: I don't know the answer to that.
[21] Q: Do you know whether the questions and concerns
[22] were found to ever be meritorious?
[23] A: What I recall right now is that we believed
[24] that there was an error in the procedure that was used
[25] to do the red lining. We did not find it to be harmful

Page 31

[1] to the products we were building in any way.
[2] Q: And when you say, "we" believe there was an
[3] error, who are you referring to?
[4] A: I'm trying to recall who brought that concern
[5] to me initially, and I don't know.
[6] Q: Did the M.E. who replaced Ms. Wrede bring the
[7] concern to you directly?
[8] A: No.
[9] Q: It was that M.E.'s manager?
[10] A: Yes.
[11] Q: Do you know if there is any written
[12] documentation about this concern about Ms. Wrede's
[13] following procedures with regard to red lining?
[14] A: I don't know.
[15] Q: Did you send any memos or write any notes about
[16] the issue?
[17] A: I don't recall writing anything about that
[18] issue.
[19] Q: Do you recall receiving any written material on
[20] that issue?
[21] A: No, I don't recall.
[22] Q: Is it possible?
[23] MR. NAGY: Objection; form. Anything is
[24] possible.
[25] THE WITNESS: I don't know if it's possible.

Page 32

[1] Q: BY MS. KRUSE: Can you describe any other
[2] weaknesses that you're aware of with regard to Renee
[3] Wrede as an M.E. at Boeing in 2001 and 2002?
[4] A: No.
[5] Q: Have you told me all the weaknesses you're
[6] aware of?
[7] A: I believe that's correct.
[8] Q: Can you look at Exhibit 14 again,
[9] Mr. Feuerstein? Are you aware of why Ms. Wrede scored
[10] below meets expectations on the Quality and Productivity
[11] line?
[12] A: No, I'm not directly aware of that.
[13] Q: And do you know why Ms. Wrede scored below
[14] meets expectations on the People Working Together line?
[15] A: No.
[16] Q: Have you heard the term, "Excess Declarations"?
[17] A: Yes.
[18] Q: And what are those?
[19] A: When we foresee a need to reduce our work force
[20] because of reductions in our level of funding or just
[21] general reductions in our business base, we review where
[22] we are in terms of our head count and write up what's
[23] called an Excess Declaration, which is a document that
[24] tells HR and the rest of our company, our site, that we
[25] have — we will have an excess number of employees in

Page 33

[1] specific job classifications, by job classifications,
[2] skill management code, and quantity of employees.
[3]  **Q:** And you used the term "we," when "we" foresee
[4] the need to reduce the work force. In 2001 and 2002,
[5] who would you have meant by "we"?
[6]  **A:** Myself and my managers.
[7]  **Q:** Who was your supervisor in 2002?
[8]  **A:** Howard Conroy.
[9]  **Q:** And what's his title?
[10]  **A:** At the time he was director of production
[11] engineering.
[12]  **Q:** And besides Mr. Conroy in 2002, were any other
[13] higher-level managers involved in the decision that —
[14] or the process of deciding that the work force needed to
[15] be reduced?
[16]  **A:** No.
[17]  **Q:** Do you recall in 2002 how many times that you
[18] issued an Excess Declaration for M.E.s in skill code
[19] D32?
[20]  **A:** I don't recall.
[21]  **Q:** Did you ever issue an Excess Declaration in
[22] 2002 and then decide not to do the RIF assessment?
[23]  **A:** I don't recall that either.
[24]  **Q:** In 2002, what was Mr. Conroy's role in
[25] determining that there was an excess in the work force?

Page 34

[1]  **A:** Not much. We were the ones who were getting
[2] our head count forecast projections. We were the only
[3] ones who had manufacturing engineers, so that — those
[4] projections were pretty specific to us. So we would
[5] receive that, and I would certainly let Howard know what
[6] we intended to do. But in terms of the analysis and who
[7] made the decision in terms of job classification, skill
[8] management code, and quantities of heads, that was
[9] myself and my managers.
[10]  **Q:** So your managers were also involved in
[11] determination of when to do an Excess Declaration?
[12]  **A:** Yes.
[13]  **Q:** You said, we were getting our head count
[14] forecast projections. What are those?
[15]  **A:** From our finance department we get a forecast
[16] that shows what our head count levels should be going
[17] off the next six months or twelve months, shows by month
[18] where we should be based on our business base.
[19]  **Q:** Then how do you determine whether to declare an
[20] excess once you have the head count forecast projection?
[21]  **A:** If it looks like we have — we will be at a
[22] lower funding level than the staff we have on board, we
[23] declare an excess.
[24]  **Q:** Do you know whether you did any Excess
[25] Declarations at Boeing in the year 2001?

Page 35

[1]  **A:** I don't know.
[2]  **Q:** Can you turn to Exhibit 11, please. You see
[3] this is an Excess Declaration that you issued on
[4] March 3rd, 2002?
[5]  **A:** Yes.
[6]  **Q:** Who's Jim Light?
[7]  **A:** Jim Light is in our Human Resources department.
[8]  **Q:** And who's Bob Cassidy?
[9]  **A:** Bob Cassidy was my manager at the time of this
[10] declaration in March.
[11]  **Q:** Was he in the position later occupied by Howard
[12] Conroy?
[13]  **A:** Yes.
[14]  **Q:** So did Mr. Cassidy play the same role that
[15] Mr. Conroy did, largely, that you would advise him if
[16] you found it necessary to do an Excess Declaration?
[17]  **A:** Yes.
[18]  **Q:** Did a RIF assessment occur as a result of this
[19] Excess Declaration?
[20]  **A:** Yes.
[21]  **Q:** Do you know when the RIF assessment was
[22] conducted?
[23]  **A:** I believe April.
[24]  **Q:** How did you determine that you had an excess of
[25] two heads in the M.E.s in skill code D32?

Page 36

[1]  **A:** Our judgment. We looked at the head count
[2] projections and we knew what work we would have
[3] remaining and used our judgment to say, based on what
[4] we — what we know, we were — made this declaration.
[5]  **Q:** Were all four of your managers involved in the
[6] decision to make this Excess Declaration in March 2002?
[7]  **MR. NAGY:** Objection; form.
[8]  **THE WITNESS:** Yes.
[9]  **Q: BY MS. KRUSE:** And how were they involved?
[10]  **A:** We sat around a table looking at our head count
[11] projections, and we talked about what we knew from each
[12] of our areas, what work would be affected and how it
[13] would be affected and came up with these numbers and
[14] these classifications.
[15]  **Q:** Do you know if individuals in D32 actually got
[16] RIF notices based on the RIF assessment conducted for
[17] this Excess Declaration?
[18]  **MR. NAGY:** You're on Exhibit 11?
[19]  **MS. KRUSE:** Exhibit 11.
[20]  **MR. NAGY:** Do you need to look at something to
[21] refresh your memory?
[22]  **THE WITNESS:** Yeah. I don't have the final —
[23] I mean, I assume it's in here somewhere, the final —
[24]  **MR. NAGY:** Don't assume. If you don't know
[25] without looking, don't answer the question.